IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | Criminal No. 4:15cr80 |
| **v.** ) | |
| ) | Sentencing Date: July 18, 2016 |
| **QUANTAVIUS DURHAM,** ) | |
| ) | |
| **Defendant.** ) | |

### POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING AND MOTION TO GRANT DEFENDANT ADDITIONAL ONE-LEVEL DECREASE FOR ACCEPTANCE OF RESPONSIBILITY

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, and Amy E. Cross, Special Assistant United States Attorney, hereby submits its position with respect to Defendant Quantavius DURHAM's (hereinafter "Defendant" or "DURHAM") sentencing factors. In the Presentence Investigation Report (PSR) prepared in this matter, the United States Probation Office determined the applicable Guidelines Range on Count Three to be 97 to 120 months (restricted) imprisonment, based upon an Offense Level Total of 30 and a Criminal History Category of I,[1] and another mandatory 120 months on Count Four. In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and does not dispute any of the sentencing factors set forth therein nor the Guideline calculation. The Defendant has not noted any objections to the pre-sentence investigation report; however, he has asked the Court for a significant variance below the low-end of the advisory guidelines.

---

[1] The Defendant's advisory guideline range of 97 to 121 months falls above the statutory maximum provided for violation of Title 18, United States Code, Section 924(c); therefore, his guidelines reflect a restricted range of 97 months to 120 months on Count Three.

For the reasons outlined below, the United States respectfully submits that a term of 217 months' imprisonment, would be sufficient, but not greater than necessary, to accomplish the goals of 18 U.S.C. § 3553(a).

**I.    Motion**

The United States moves this Court, pursuant to U.S.S.G. § 3E1.1(b), to grant an additional one-level reduction in the offense level for acceptance of responsibility. The Defendant assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby allowing the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

**III.    Background**

On March 14, 2016, the Defendant entered a guilty plea pursuant to a written plea agreement to Count Three, specifically Attempted Murder in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5) and (2), and Count Four, Discharge of a Firearm During a Crime of Violence, in violation of Title 18, United States Code, Section 924(c)91)(A)(iii). The matter was set for sentencing on July 18, 2016, after preparation of a presentence investigation report.

**III.    Position on Sentencing and Argument**

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does

serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

### A. *Nature and Circumstances of the Offense*

On June 5, 2015, QUANTAVIUS DURHAM and his co-defendants, Eric EDMUNDS and Raquille JACKSON learned that 36th Street Bang Squad member Kevonne Turner had been killed on June 3, 2015 by a rival gang, the Walker Village Murder Gang. JACKSON, EDMUNDS and DURHAM elected to continue the rivalry between the two criminal street gangs on the Peninsula by conspiring to find and kill J.S., the alleged murderer. That afternoon, members and associates of the 36th Street Bang Squad went to Bridgeport Academy on Briarfield Road for the purposes of finding J.S. Upon the direction of Raiquan TURNER, the group followed a Hampton City public school bus from the school to the Derby Run Apartments on Floyd Thompson Drive in Hampton. PSR ¶ 7-5. JACKSON, EDMUNDS, and TURNER, along with other members and associates of the 36th Street Bang Squad, were armed, and attempted to find J.S. in the apartment complex. PSR ¶7-6. EDMUNDS was carrying a firearm that had been given to him by DURHAM. DURHAM drove the vehicle to the Sonic parking lot next to the Derby Run apartments. Unable to find J.S., TURNER, JACKSON and EDMUNDS returned to the vehicle. *Id.*

DURHAM moved from the driver's seat to the front passenger seat. JACKSON took the driver's seat. EDMUNDS sat behind JACKSON, and TURNER was behind DURHAM. PSR ¶ 7-7. As the men left the location, JACKSON drove by the entrance to Derby Run again. At that time TURNER observed two members of the rival Walker Village Murder Gang walking towards Sonic and drew the others' attention to them. JACKSON made a u-turn and came back around. JACKSON stopped on the four lane road and held his 9mm Ruger with an extended clip out of the window. However, he did not have a clear shot. He drew his gun back inside the car and called out to the rival gang members. As they approached, JACKSON again held his firearm out the window and began shooting. EDMUNDS quickly followed. PSR ¶ 7-7. When police stopped the vehicle fleeing from the scene of the shooting, two of the three firearms in the vehicle were at DURHAM's feet. PSR ¶ 7-8. According to witnesses, JACKSON was an associate of the 36th Street Bang Squad and committed the shooting in order to impress TURNER, who had been a long-time member of the gang. PSR ¶7-10.

Upon his arrest, DURHAM was given his legal rights. He elected to waive his rights and talk to police. At that time, he admitted that he and EDMUNDS were members of the Blick'Em Boys and that the 36th Street Bang Squad had an alliance with the Blick'Em Boys. PSR ¶7-10. DURHAM told police that he gave EDMUNDS the Kel-Tec 9mm pistol that EDMUNDS used when EDMUNDS, TURNER, JACKSON and other enterprise members searched for J.S. The same pistol that EDMUNDS used in the shooting that followed. *Id*. DURHAM admitted that they planned to kill J.S. because he was part of the Walker Village Murder Gang and had disrespected the 36th Street Bang Squad by posting pictures of their dead members and then by allegedly killing Kevonne Turner, a 36th Street Bang Squad member, on June 3, 2015. *Id.*

### B. *History and Characteristics of the Defendant*

<u>Family and Upbringing</u>

Defendant Quantavius DURHAM's history and characteristics unfortunately show a young man who despite family support, education and opportunity, chose to associate himself with the 36th Street Bang Squad, arm himself and his co-defendant and attempt to hunt down a rival gang member. DURHAM was the only shared child of Alfred Hill and Nicole Barrow. PSR ¶ 40. DURHAM was raised by his mother with minimal contact or support by his father. However, DURHAM's stepfather, William Barrow, who married DURHAM's mother in 2003, served as a father-figure for the Defendant. The Defendant stated that he had a middle-class upbringing with no abuse or problems. PSR ¶ 41.

DURHAM has at least four half siblings.[2] The maternal siblings range in age from 13 to 17 years old. At age 19, the Defendant is the eldest child. All his maternal half-siblings are students and live with DURHAM's mother. PSR ¶ 40.

According to the Defendant, he has never been married and has no children. PSR ¶ 42. The Defendant maintains that his legal residence was with his mother. However, in his statement to police upon his arrest, he was unsure of his mother's address. He indicated to police that he had "been jumping around" since he returned to the area after his semester ended and claimed his legal residence was in Raleigh, North Carolina.[3]

---

[2] According to the PSR, DURHAM's birth father had other children; however, no information was known about those siblings.

[3] The United States will have the case agent to testify about the Defendant's statements to police and the agent's own investigation into the whereabouts of DURHAM during the investigation into the offenses before the Court.

5

### Education and Employment

DURHAM graduated from a Hampton high school in June, 2014. PSR ¶ 47. DURHAM attended one semester of college in Raleigh, North Carolina in 2015, studying criminal justice. During his first college semester, DURHAM failed five of six classes and maintained a .231 grade point average. *Id.*

After graduation in 2014, the Defendant reported that he worked as a cashier at Busch Gardens for four months until he was fired. PSR ¶50. He has no other verifiable employment. He has maintained that he worked at the commissary on the Fort Eustis military base, a job that his mother confirmed, from September to December, 2015. However, there are no records of his employment and three different supervisors denied the Defendant ever being employed at the location. PSR ¶ 49.

### Health and Substance Abuse History

Physically, the Defendant has no reported issues with exception of juvenile asthma, which was treated with medication. PSR ¶ 44. The Defendant contends that he had no mental health issues, nor has he received any treatment for the same. PSR ¶ 45. However, the Defendant's mother claims that he was diagnosed with Attention Deficit Hyperactivity Disorder at age 10. However, he was never prescribed medication. *Id.*

In addition to good physical and mental health, the Defendant reports minimal drug usage. He states that he experimented with alcohol at age 18 but did not like it. He admits that he has smoked marijuana once a month since he was 18. PSR ¶ 46.

### Criminal History

Finally, the Defendant, at age 19, does not have a significant criminal history. The Defendant's first contact with the criminal justice system was at age 12 due to an arrest for

possession with intent to distribute an imitation narcotic; however, that charge was nolle prossed in May 2009. It is significant that the Defendant's next contact with law enforcement was his state arrest for the underlying events. As the Defendant has no prior criminal convictions, his criminal history category is a I.

### C. Other Factors to be Considered Under 18 U.S.C. § 3553(a)

Deterrence

Among the other factors a sentencing court is to consider under Section 3553(a), the United States would highlight the need for the sentence imposed in this case to reflect the seriousness of the Defendant's offense and afford adequate deterrence to future criminal conduct, both general and specific. After his arrest, police spoke with DURHAM about the violence that was going on between Walker Village and the 36th Street Bang Squad. One detective talked to him about the people dying on both sides of the rivalry. She confronted DURHAM on the possibility of retaliation against him and asked him, "What can we do to stop this violence?" DURHAM told her, "I don't know. I really don't. It's never gonna stop for real." More than ever, deterrence is essential in these cases – for the individual enterprise member and for those in the general public who may be drawn to the gang.

Defendant Request for Leniency and a Variant Sentence

The Defendant has asked the Court for leniency in the form of a significant variance – requesting that the Court only sentence the Defendant to the mandatory 120 months on Count Four. Among the evidence presented to the Court in support of his request, the Defendant has asked the Court to review multiple letters supporting a lenient sentence for the Defendant. The overarching theme to these letters is that the Defendant simply was with the wrong people at the wrong time, that he was pulled into something that he was not a part of. However, that is not the

case. Quantavius DURHAM "grew up" with EDMUNDS. Even after he was charged at local level and bonded on the underlying facts, the Defendant continued to associate with gang members. He continued to support the gang and its reputation.[4] His state arrest was not a wake-up call, yet his family and friends claim that his federal arrest has been.

Further, the United States would highlight that this is not the case for such treatment. This Defendant has had every opportunity. He is a high school graduate. He was given the chance to attend college. He has a family that loved and provided for him. However, he chose a different path. On June 5, 2015, DURHAM joined a criminal conspiracy to murder a rival gang member. In broad daylight, the Defendant and his co-defendants met at a public high school to confront a rival gang member. DURHAM provided his firearm to EDMUNDS. They followed a public school bus, stalking their rival, but failed to find him. In the middle of the day, outside a busy fast food restaurant, TURNER identified the targets – two rival Walker Village Murder gang members – and his co-conspirators did what they were expected to do and attempted to kill their rivals as they walked on the sidewalk near a busy intersection. EDMUNDS used DURHAM's gun.

The war between rival gangs spilled onto the busy streets of Hampton, shutting down an intersection in afternoon rush hour traffic. Yes, the Defendant was young, but most of these gang members are. Yes, the Defendant made a poor decision, but that serious, potentially deadly decision armed a co-defendant and allowed a shooting in broad daylight at a busy intersection. Yes, the Defendant has no convictions, but the guidelines account for the lack of criminal history. The United States would respectfully disagree.

---

[4] The United States will call the case agent to show the Defendant's continued association with and furtherance of the gang activities. Further, the United States may offer additional evidence from social media and YouTube showing the Defendant's own statements and interactions with other gang members during the investigation of this incident.

Given the serious and violent nature of the matters before the Court – the conspired death of one rival gang member and the attempted murder of two others, the United States submits that these factors would be best addressed by a sentence of 217 months (Count Three – 97 months, Count Four – 120 months).

<pre>
                                    Respectfully submitted,

                                    Dana J. Boente
                                    United States Attorney

                              By:   ___/s/_____
                                    Amy E. Cross
                                    Special Assistant United States Attorney
</pre>

CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of July, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to the following:

    Lawrence Woodward, Esquire
    317 30th Street
    Virginia Beach, VA 23451

I HEREBY CERTIFY that on this 11th day of July, 2016, I emailed a true and correct copy of the following to the following:

    Jason Cole, Sr. U.S. Probation Officer
    600 Granby Street, Suite 200
    Norfolk, Virginia 23510

    /s/
    Amy E. Cross
    Special Assistant United States Attorney
    Virginia State Bar No. 45289
    Attorney for the United States
    United States Attorney's Office
    721 Lakefront Commons, Suite 300
    Office Number: 757-591-4026
    Facsimile Number: 757-591-0866
    Email: amy.cross@usdoj.gov