IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:15cr80 |
| | ) | |
| QUANTAVIUS DURHAM, | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Response Opposing Defendant's Motion for Compassionate Release**

The novel coronavirus is spreading broadly among the U.S. population, including among members of the public, health-providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local government. Against that backdrop, Defendant Quantavius Durham seeks to be released from prison under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i) as a means to control the spread of the coronavirus within prison. But his request should be rejected. Using compassionate release in his case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

## BACKGROUND

1. Defendant Quantavius Durham (hereinafter "Durham" or "Defendant") was charged in a four-count criminal indictment on November 17, 2015 by a federal grand jury sitting in Newport News. ECF 4. The charges included the following:

- <u>Count One:</u> Conspiracy to Commit Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. §1959(a)(5);

- Count Two: Possession of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. §924(c)(1)(A)(i);

- Count Three: Attempted Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. §§ 1959(a)(5) and 2; and

- Count Four: Discharge of Firearm during a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

Durham was arrested on December 14, 2015. On December 17, 2015, Durham waived an immediate detention hearing, and a trial date was set for March 29, 2016. ECF 21, 27 and 28.

2.      The four-count indictment was based on the Defendant's conspired and attempted murder of rival gang members on June 5, 2015 in Hampton, Virginia.  Durham, along with his co-defendants, Raiquan Turner, Eric Edmunds and Raquille Jackson, followed a Hampton public school bus attempting to locate and kill a member of the Walker Village Murder Gang (WVMG) in retaliation for his killing of a 36th Street Bang Squad member two days prior.  While the men failed to find the gang member they sought, they located two other members of WVMG. Durham provided a firearm to Edmunds, sitting in the backseat on the driver's side.  Driver Jackson and Edmunds, both on the side nearest to the intended targets, opened fire in the middle of a busy intersection between two busy fast food restaurants just before rush hour.   Durham took the firearms from his co-defendants as they fled the location.  He admitted to law enforcement that the shooting was done on behalf of the 36th Street Bang Squad to retaliate against WVMG.

3.      On March 14, 2016, Durham entered a plea to Counts Three and Four of the criminal indictment before this Court.  A sentencing was set for July 18, 2016 after the preparation of a pre-sentence investigation report.  ECF 80.

4.     On July 18, 2016, this Court sentenced the Defendant to a total of 210 months incarceration (Count Three: 90 months and Count Four: 120 months). ECF 129.

5.     In May 2017, Durham filed a motion to vacate his conviction under 28 U.S.C. § 2255, which he subsequently withdrew after significant briefing and presentation of evidence. ECF 150, 161.  On August 15, 2018, the Court dismissed the Defendant's 2255 motion and advised him of his right of appeal.  ECF 163, 164.

6.     On July 8, 2019, Durham filed a letter motion requesting appointment of counsel to assist him in obtaining relief based on *United States v. Davis*, 139 S.Ct. 2319 (2019). ECF 167. The Court denied the Defendant's motion finding that *Davis* was not applicable to Defendant as the Defendant's "predicate offense – Attempted Murder in Aid of Racketeering – satisfie[d] the force clause contained in the definition of crime of violence in § 924(c)(3)(A) because it 'has an element the use, attempted use, or threatened use of physical force against the person or property of another.'" ECF 169, citation omitted.  The Defendant appealed.  On October 22, 2019, the Fourth Circuit affirmed this Court's decision, finding no reversible error. ECF 170, 173.

7.     On May 4, 2020, Durham filed a letter motion with this Court requesting that the Court reconsider his sentence or permit him to serve his remaining sentence on house arrest with his family in South Carolina, due to the on-going global pandemic of Covid-19.  ECF 178. Durham requested reconsideration based on a desire to "be there and help [his] family through this crisis [,]" some of whom have diabetes or asthma.  Durham complains that he has had asthma since he was a child.  Durham did not state any complications or medical concerns he has had while incarcerated and provided no medical documentation of his condition or its impact on

his incarceration.[1]  He maintains that he has realized that "life is short and [he doesn't] want to catch COVID-19 and die in prison."

8.      Upon receipt of the Defendant's motion, the United States contacted the Defendant's case manager at USP Lee, a high-security United States penitentiary.  As of May 7, 2020, there have been no positive COVID-19 lab results for prisoners or staff at USP Lee.  (See https://www.bop.gov/coronavirus/index.jsp, visited May 7, 2020).   According to correspondence from case manager Jon Osteen, Durham had not filed any requests regarding compassionate release within BOP.  (Email, dated May 6, 2020).  Further, while Durham had completed some programs while in custody, including AIDS Awareness, Psychology Self Study, Health Fair, Social Studies, and Drug Education,  he had also incurred "numerous incident reports, including but not limited to, Code 104 Possessing a Dangerous Weapon, Code 205 Engaging in Sexual Acts, and Code 224 Assaulting without Serious Injury."

9.      According to the Bureau of Prison's website, Durham's projected release date from the Bureau of Prisons is January 21, 2031, leaving more than ten years of active incarceration on his sentence.  (See https://www.bop.gov/inmateloc/).

**RESPONSE**

I.      **Defendant's request for compassionate release should be evaluated against a practical and legal backdrop.**

The Federal Bureau of Prisons is actively working on the critical problem of containing the spread of the coronavirus within prisons.  BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to

---

[1] According to the Pre-Sentence Investigation Report filed in the underlying case, "Durham reports being diagnosed with asthma as a child and using an inhaler until the age of 11 or 12." ECF 118, PSR ¶ 44, emphasis added.

educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for defendant's request for compassionate release.

> **A. The CARES Act expanded the ability of the BOP to use home confinement for at-risk inmates once emergency conditions impacted BOP's function and evaluation of an inmate's release plan and 14-day quarantine prior to release.**

Before the CARES Act was passed, § 3624(c)(2) provided the "Bureau of Prisons" with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, up to now, BOP has placed an additional 2,144 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp, visited May 7, 2020), focusing on,

---

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released. Inmates do not have to apply to be considered for home confinement.

BOP's releases of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

In addition to these efforts to increase the use of home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

### B. Modified operation plans within the BOP institutions are in place to prevent spread of COVID-19 within BOP facilities among prisoners and staff.

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the

6

extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for Covid-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities

are also suspended.  Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### C. Defendant's request without BOP review effectively defeats the provisions of the CARES Act and improperly asks the Court to evaluate a large range of ever-changing circumstances concerning the inmate's continued incarceration.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts.  And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

Under the present circumstances, courts are not well positioned to evaluate a range of quickly changing facts:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history

8

points.  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12 New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.*  Any release should include measure to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Avoiding misallocation of testing resources.*  Any request by an inmate should appropriately triage the use of available testing by medical need, not by an unsystematic series of court orders.

- *Addressing the need for food, housing, medical care, transportation, employment, and other necessities.*  Any release order should evaluate whether a released inmate could find—during a pandemic—food, medical care, housing, safe (often interstate) transportation needed to relocate from prison to the inmate's home, and employment during a time when an extraordinarily large number of people are losing their jobs.

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.*  Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

- *Making release decisions fast enough and accurately enough to make a difference.* An inmate's release request requires a court to determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison.

- *Appropriately prioritizing supervision resources.* The Probation Office's resources to supervise released inmates are necessarily limited, and any inmate's release should be assessed against the comparative advantages that another inmate might receive from those same supervisory resources.

To avoid a mass release of inmates that has a serious, negative effect on public welfare, the Court should also take into account the risk to probation officers, police officers, and others who must immediately cope with and supervise released inmates.

This list is not exhaustive and, indeed, could include many additional considerations. The point is that the factors cited above illustrate a general truth—there are no known examples of effectively litigating out of a crisis by taking up thousands of cases simultaneously in hundreds of courtrooms across the country and attempting to have the judicial process evaluate prisoner releases in a pandemic that changes daily and even hourly. A more systematic remedy than individual litigation in court is needed, and Congress provided a means for arriving at a more systematic response by amending § 3624(c)(2) while the pandemic is ongoing.

BOP has a massively important task ahead of it. Layering the burdens of a huge volume of emergency litigation on top of the difficult challenges that the pandemic has handed BOP is unhelpful. And it is likely to incentivize a counterproductive race to the courthouse in countless cases—a race that will necessarily require this Court to mete out limited re-entry and supervision resources on a first-come-first-serve basis that favors defendants who flout the administrative processes in place to prioritize release for the most vulnerable and least dangerous.

BOP has 140,708 federal inmates in BOP-managed institutions and 10,817 in community-based facilities. The BOP staff complement is approximately 36,000. As of 05/06/2020, there are 2,100 federal inmates and 365 BOP staff who have confirmed positive test results for Covid-19 nationwide. Currently, 559 inmates and 149 staff have recovered. There have been 42 federal inmate deaths and 0 BOP staff member deaths attributed to Covid-19. https://www.bop.gov/coronavirus/index.jsp (updated daily at 3:00 p.m.) (last visited May 7, 2020).

The above points inform the legal framework discussed below.

## II.	Defendant has failed to provide BOP with the required 30-day period to evaluate his request for compassionate release because of COVID-19.

Under § 3582(c)(1)(A), a defendant cannot obtain relief from this Court until BOP is given 30 days to evaluate the defendant's motion for compassionate release based on the threat of COVID-19. The Third Circuit recently confirmed that where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, __F.3d__, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). The plain language of § 3582(c)(1)(A) confirms the Third Circuit's conclusion in *Raia*, and this Court should follow that ruling.

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A).  The requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court.  The plain language of the statute provides that a "court may not modify" a sentence "except" "after the defendant has fully exhausted" administrative appeals from BOP's denial "or the lapse of 30 days."  This statutory language imposes a mandatory exhaustion requirement and creates no exceptions of the type defendant seeks.

The Supreme Court has rejected "special circumstances" exceptions when a statute imposes a mandatory exhaustion requirement.  *See, e.g., Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  The "mandatory language" of the statute that the Court considered in *Ross*, the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), "means a court may not excuse a failure to exhaust, even to take" "special circumstances" "into account."  *Ross*, 136 S. Ct. at 1856.  The Supreme Court continued that exceptions to exhaustion may apply when the exhaustion requirement is judge-made, but not for statutory exhaustion requirements that have no provision for the asserted exception.  "No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amendable to judge-made exceptions."  *Id*. at 1857.  "But a statutory exhaustion provision stands on a different footing.  There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to.  For that reason, mandatory exhaustion

statutes *like the PLRA* establish mandatory exhaustion regimes, foreclosing judicial discretion." *Id*.

*Raia* is consistent with these principles when it concluded that, because an inmate "failed to comply with § 3582(c)(1)(A)'s exhaustion requirement," that failure "foreclose[ed] compassionate release at this point." 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). "[T]his view appears to dominate among courts that have considered whether they may excuse a failure to satisfy 18 U.S.C. § 3582(c)(1)(A)'s filing requirements." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2 n.1 (E.D. Mich. Apr. 8, 2020).

Many rulings in the Eastern District of Virginia have agreed that exhaustion is required or that, even if there were exceptions, the defendant's arguments about Covid-19 were insufficient to excuse the defendant's failure exhaust. *See, e.g., United States v. Mitchell*, 2:18CR117, ECF No. 48 at 3 (E.D. Va. Apr. 21, 2020) (Davis, C.J.) ("Defendant's failure to satisfy the procedural obligations for a prisoner-initiated compassionate release motion 'presents a glaring roadblock' to the relief he seeks.") (quoting *Raia*, 2020 WL 1647922 at *2); *United States v. Adams*, No. 1:88CR46, ECF No. 32, at 4 (E.D. Va. Apr. 17, 2020) (Ellis, S.J.) (Section "3582(c)(1)(A)'s exhaustion requirements must still be complied with, even in light of COVID-19"); *United States v. White*, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (Smith, S.J.) ("The court may not consider the Defendant's Motion at this juncture because he has not exhausted his administrative remedies."); *United States v. Bartlett*, No. 4:14CR64, ECF No. 59, at 3, (E.D. Va. Apr. 17, 2020) (Doumar, S.J.) ("The public health emergency caused by the coronavirus is an extremely important consideration that the Court does not take lightly. However, Defendant's Letter Motion fails to establish that Defendant has complied with the procedural requirements of 18 U.S.C. § 3582(c)."); *United States v. Feiling*, No. 3:19CR112 (DJN), 2020 WL 1821457, at

*5 (E.D. Va. Apr. 10, 2020) (Novak, J.) ("[T]he mere existence of COVID-19 among the prison population and an inmate's susceptibility to it do not justify waiver of the administrative exhaustion requirement under § 3582(c)(1)(A)."); *cf. United States v. Smith*, No. 2:18CR96, ECF No. 39 at 6 (E.D. Va. Apr. 22, 2020) (Allen, J.) ("[I]t appears that under the plain language of [18 U.S.C. § 3582(c)(1)(A)], Congress intended that the BOP have an opportunity to evaluate and act on a prisoner's motion *before* the Court would be given jurisdiction over such a motion. It did not intend to supplant an agency-exclusive process with an entirely judicial process; it intended to provide a district court with jurisdiction to reduce a sentence without agency action *only if* the agency fails to act within 30 days.").[3]

---

[3] Many other rulings from district courts in the Fourth Circuit agree. *See, e.g., United States v. Carden*, No. CR JKB-15-0016, 2020 WL 1873951, at *1 (D. Md. Apr. 15, 2020) ("[T]his Court need not make th[e] determination [whether the exhaustion requirement is jurisdictional] to resolve this motion. It is sufficient for purposes of this motion that § 3582(c)(1)(A) mandates that the defendant exhaust his or her administrative remedies prior to seeking relief in this Court."); *United States v. Fabelo*, No. CR 3:16-00885-MGL-15, 2020 WL 1866449, at *1 (D.S.C. Apr. 14, 2020) ("[Because [defendant] fails to allege he filed a petition with the Warden and exhausted the administrative remedies, he is unentitled, under the statute, to move for the sentence reduction on his own."); *United States v. Chamizo*, No. CR 3:16-00885-MGL-20, 2020 WL 1866448, at *1 (D.S.C. Apr. 14, 2020) (concluding the same); *United States v. Underwood*, No. CR TDC-18-0201, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020) ("The Court therefore agrees with other judges in this District and elsewhere that a prisoner must exhaust the administrative appeal process, or wait 30 days, before his claim may be considered."); *United States v. Price*, No. GJH-15-393, 2020 WL 1694347, at *2 (D. Md. Apr. 7, 2020) ("The exhaustion requirements of § 3582(c) are jurisdictional in nature, and the Court may not waive them." (internal quotation marks omitted)); *United States v. Sundblad*, No. CV 6:16-CR-00047-JMC, 2020 WL 1686237, at *2–3 (D.S.C. Apr. 7, 2020) ("'[G]iven BOP's shared desire for a safe and healthy prison environment' this court concludes that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." (quoting *Raia*, 2020 WL 1647922, at *2); *United States v. Ashley*, No. CR RDB-06-0034, 2020 WL 1675994, at *2 (D. Md. Apr. 6, 2020) ("Recently, this Court held that it does not have jurisdiction to adjudicate motions made under 18 U.S.C. § 3582(c)(1)(A)(i), … unless the prisoner first exhausts certain administrative remedies with the Bureau of Prisons … or waits 30 days without a BOP determination."); *United States v. Dungee*, No. 7:15CR00005, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020) (denying motion after concluding that defendant "has

not shown that he has exhausted his administrative remedies"); *United States v. Johnson*, No. CR RDB-14-0441, 2020 WL 1663360, at *4 (D. Md. Apr. 3, 2020) (denying motion after concluding that defendant failed to exhaust administrative remedies and that "the Court's jurisdiction is conditioned upon the exhaustion of administrative remedies or the BOP's failure to act after the elapse of 30 days"); *United States v. Sundblad*, No. CV 6:16-CR-00047-JMC, 2020 WL 1650041, at *2 (D.S.C. Apr. 3, 2020) (observing that "this court is also bound by the confines of the law, and a district court does not possess the requisite legal authority to modify or reduce a defendant's sentence under a theory of compassionate release where the defendant has not first petitioned the BOP."); *United States v. Oliver*, 2020 WL 1505899, at *1 (D. Md. Mar. 30, 2020) ("[B]ecause Oliver has not pursued the procedure established by § 3582(c)(1)(A), this Court may not grant a motion to modify her sentence."); *United States v. Williams*, No. JKB-15-0646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020) (finding no exceptions to exhaustion requirement).

Some defendants have sought to invoke certain district court decisions from the Southern District of New York—a district that has been heavily affected by the coronavirus. But even there, the vast majority of decisions—at least 21 so far—have denied Covid-19-related compassionate release motions because defendants had not exhausted their claim with BOP. *See United States v. Ogarro*, No. 18-CR-373-9 (RJS), 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) (Sullivan, Cir. J.); *United States v. Engleson*, No. 13-CR-340-3 (RJS), 2020 WL 1821797, at *1 (S.D.N.Y. Apr. 10, 2020) (Sullivan, Cir. J.); *see also United States v. Demaria*, No. 17 CR. 569 (ER), 2020 WL 1888910, at *3–4 (S.D.N.Y. Apr. 16, 2020)*; United States v. Bonventre*, No. 10-CR-228-LTS, 2020 WL 1862638, at *2 (S.D.N.Y. Apr. 14, 2020); *United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1862251, at *2 (S.D.N.Y. Apr. 14, 2020); *United States v. Pereyra-Polanco*, No. 19 CR. 10 (NRB), 2020 WL 1862639, at *1 (S.D.N.Y. Apr. 14, 2020); *United States v. Rabadi*, No. 13-CR-353 (KMK), 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020); *United States v. Reese*, No. 12 CR 629 (VM), 2020 WL 1847552, at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Rensing*, No. 16 CR 442 (VM), 2020 WL 1847782, at *1 (S.D.N.Y. Apr. 13, 2020); *United States v. Fana*, No. 1:19-CR-00011-GHW, 2020 WL 1816193, at *5 (S.D.N.Y. Apr. 10, 2020); *United States v. Matera*, No. 02-CR-743-6 (JMF), 2020 WL 1700250, at *1 (S.D.N.Y. Apr. 8, 2020); *United States v. Roberts*, No. 18-cr-528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020); *United States v. Villanueva*, No. 18-cr-472-3 (KPF), ECF No. 85 (S.D.N.Y. Apr. 8, 2020); *United States v. Carr*, No. 14 CR. 055 (LGS), 2020 WL 1689771, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Miselevich*, No. 16 CR. 763-09 (LGS), 2020 WL 1689779, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Ramos*, No. 14 CR. 484 (LGS), 2020 WL 1685812, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Lowry*, No. 18 Cr. 882 (LTS), 2020 WL 1674060, at *2 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, No. 18-CR-273, 2020 WL 1674137 at *1 (S.D.N.Y. April 6, 2020); *United States v. Woodson*, No. 18-cr-845 (PKC), 2020 WL 1673253, at *3–4 (S.D.N.Y. Apr. 6, 2020); *United States v. Hernandez*, No. 19-cr-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18-cr-602 (WHP), 2020 WL 1428778, at *2 (S.D.N.Y. Mar. 24, 2020).

A minority of courts have read the statute as permitting a court to override the 30-day period for BOP to review a claim, even though nothing in the text of the statute supports such a reading. These courts have concluded that "Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today." *United States v. Haney*, __F. Supp. 3d__, 2020 WL 1821988, at *3 (S.D.N.Y.); *see also Poulious v. United States*, No. 2:09CR109, 2020 WL 1922775 (E.D. Va. Apr. 21, 2020) (Jackson, J.); *United States v. Jones*, No. 3:11cr249 (E.D. Va. Apr. 3, 2020) (Lauck, J.) (waiving exhaustion requirement after government "did not oppose" defendant's request for compassionate release).

As an initial matter, *Haney*'s approach of adding to statutory language an exception that a court thinks Congress should have included, but did not, fails to accord with the Supreme Court's principles of statutory interpretation. *See, e.g., Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) ("Even if we were persuaded that Amgen had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our 'primary guide' to Congress' preferred policy."). Just as "the word 'shall' usually creates a mandate, not a liberty," *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018), so too the phrase that "[t]he court may not modify" in § 3582(c) imposes a mandate against judicial action and does not confer discretion. Indeed, while cases like *Haney* point to what a court thinks Congress should have said in § 3582(c), even a statute's preamble or statement of purpose—and defendants can point to nothing like that here—"cannot override [a statute's] operative language." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 220 (2012)).

But cases like *Haney* overlook another important strike against their reading of the statute. In the wake of the novel coronavirus pandemic, Congress did enact a far-reaching statute to address the problems created by the pandemic, the CARES Act, and that law included a specific provision aimed at addressing the virus's spread in prison. As the United States has previously noted, the specific provision, § 12003(b)(2) of the CARES Act, broadened *BOP's powers* under § 3624(c)(2) to release inmates on home confinement. *See, e.g., United States v. White*, No. 2:07CR150, 2020 WL1906845, at *1 (E.D. Va. Apr. 17, 2020) (Smith, S.J.) (Section 3624(c)(2), as amended by § 12003(b)(2) of the CARES ACT, "does not authorize the court to place a defendant in home confinement."). Congress did not alter the exhaustion requirement in § 3582(c)(1)(A).

Later enacted statutes, like § 12003(b)(2) of the CARES Act, are informative when a court seeks to find an unstated exception to the exhaustion requirement in § 3582(c)(1)(A), for "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Here, in response to the coronavirus pandemic, Congress gave BOP the power to act but did not remove the 30-day requirement for courts to act under § 3582(c)(1)(A). And this legislative scheme makes sense. BOP is better positioned to address the problem, and it would make little sense for a court to override the language of § 3582(c)(1)(A) that BOP be given an opportunity to act first—when Congress just handed BOP, and BOP alone, expanded powers to act.

As discussed below, the requirement of a 30-day period for review by BOP is also jurisdictional, but because the United States is asserting the requirement here, it does not make a difference whether the rule is jurisdictional or not. The rule is at a minimum a mandatory

claims-processing rule, requiring a court to enforce the rule when it is invoked even if it is not jurisdictional. *See, e.g., United States v. Manrique*, 137 S. Ct. 1266, 1272 (2018) ("Mandatory claim-processing rules 'seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," and when a party "properly raise[s] them," they "are 'unalterable.'") (citations omitted).

Finally, even if a court could discard the 30-day requirement in § 3582(c)(1)(A), courts should not do so. *See United States v. Feiling*, 2020 WL 1821457, at *5 (E.D. Va. Apr. 14, 2020) ([T]he mere existence of COVID-19 among the prison population and an inmate's susceptibility to it do not justify waiver of the administrative exhaustion requirement under § 3582(c)(1)(A).").

### A.     The 30-day exhaustion requirement in § 3582(c)(1)(A) is jurisdictional.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to express statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979). As the Fourth Circuit has explained, § 3582(c) "states that a district court 'may not modify a term of imprisonment once it has been imposed' unless the Bureau of Prisons moves for a reduction, the Sentencing Commission amends the applicable Guidelines range, or another statute or Rule 35 *expressly* permits the court to do so."

*United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010). "[T]here is no 'inherent authority' for a district court to modify a sentence as it pleases." *Id.* (quoting *United States v. Cunningham*, 554 F.3d 703, 708 (7th Cir. 2009)); *see also United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Section 3582(c)(1)(A) speaks directly in terms of a court's adjudicatory power and says "[t]he court may not modify a term of imprisonment once it has been imposed except" in the circumstances enumerated in § 3582(c). Section 3582(c)(1)(A) thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the legal backdrop against which § 3582(c) was enacted. At common law a court could not modify a final judgment in a criminal case after the expiration of the court term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). After the Federal Rules of Criminal Procedure prescribed a specific window of time during which a court could modify a criminal sentence, the Supreme Court continued to treat these time limits as jurisdictional. *See United States v. Smith*, 331 U.S. 469, 473 n. 2 (1947); *Addonizio*, 442 U.S. at 189 n.17. Section 3582(c)

accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[4]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district

---

[4] A number of courts have recognized that the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *overruled on other grounds by United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remain jurisdictional after *Bowles*). Other courts disagree. *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

court lacks jurisdiction to consider a motion for compassionate release where the defendant has failed to satisfy the exhaustion requirement of Section 3582(c)(1)(A).[5]

Some courts, including the Fourth Circuit, have concluded that reconsideration of a motion for relief under a retroactive guideline amendment pursuant to 18 U.S.C. § 3582(c)(2) is not jurisdictionally barred. *See, e.g., United States v. May*, 885 F.3d 271, 275 (4th Cir. 2017) (citing cases from the 3d, 7th, 9th, and 11th Circuits). But *May* was not presented with, and did not decide, the question whether the entirety of § 3582(c) is non-jurisdictional, and hence, *May* did not decide that a court may revisit a sentence whenever it wants, as long as a party does not object. Even courts that agree with *May* continue to recognize that § 3582(c) imposes jurisdictional limits. *See, e.g., United States v. Simon*, 952 F.3d 848, 852 (7th Cir. 2020) ("Once a court sentences a criminal defendant, it has jurisdiction to continue hearing related issues only when authorized by statute or rule.") (citations omitted); *United States v. Green*, 886 F.3d 1300, 1305 (10th Cir. 2018) (treating 14-day time limit in Fed. R. Crim. P. 35(a), which § 3582(c)(1)(B) incorporates, as jurisdictional, but distinguishing limitation on successive motions or reconsideration of a motion under § 3582(c)(2) and deeming that limitation not jurisdictional); *United States v. Mercado-Flores*, 872 F.3d 25, 29 (1st Cir. 2017) (finding 14-day limit in Rule 35(a) to be jurisdictional).

While the government maintains that the time limitation in Section 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic here. Even if the

---

[5]  Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden. If the BOP rejects the request or takes no action within the 30 day window, the inmate is then free to press his position in the appropriate federal court.

exhaustion requirement of § 3582(c)(1)(A) were not jurisdictional, it is at least a mandatory

claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S.

at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within

14 days of the verdict, is a non-jurisdictional but mandatory claim-processing rule). The

government raises the rule here, and it must be enforced.[6]

### B.    *Exhaustion properly provides BOP with an opportunity to assess the claim.*

Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the

defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

such a request by the warden of the defendant's facility, whichever is earlier."[7] The requirement

of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be

excused. While Congress indisputably acted in the First Step Act to expand the availability of

compassionate release, it expressly imposed on inmates the requirement of initial resort to

administrative remedies. And this is for good reason: The Bureau of Prisons carefully reviews

and considers such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50,

Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C.

§§ 3582(c)(1)(A) and 4205(g), available at

_____

[6] Indeed, even those courts that have concluded that the requirements of
Section 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See,
e.g.*, *Taylor*, 778 F.3d at 670 (recognizing that even if a court has the "power to adjudicate" a
motion under Section 3582(c)(2), it may lack "authority to *grant* a motion . . . because the
statutory criteria are not met") (emphasis in original).

[7] Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available"
administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such
exception.

https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the Bureau of Prisons possesses considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical— importance." *Raia*, 2020 WL 1647922, at *2. Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

## III.    The Defendant Cannot Establish Extraordinary and Compelling Reasons to Warrant a Reduction.

Even if this Court were to determine that the defendant can overcome the statutory 30-day requirement for BOP review, release is not appropriate because he cannot establish "extraordinary and compelling reasons to warrant such a reduction" under 3582(C)(1)(A)(i).

A § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress has created a narrow statutory framework in which defendants, the Bureau of Prisons, and the Sentencing Commission all play a relevant part.

To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. Instead, it has delegated that

responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction." *Id.* § 1B1.13(1)(A).[8] Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). Third, the court must conclude that "[t]he reduction is consistent with this policy statement." *Id.* § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and compelling reasons:

(A)     Medical Condition of the Defendant;

(B)     Age of the Defendant;

---

[8] The statement alternatively provides that absent extraordinary and compelling reasons, a court may find that a defendant is at least 70 years old and has served at least 30 years on his conviction. *See* U.S.S.G. § 1B.13(1)(B).

(C) Family Circumstances; and

(D) Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1.  Commentary to § 1B1.13, in turn, clarifies that the open-ended

provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s

determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with, the reasons described in

subdivisions (A) through (C)." *Id.*

Consistent with subdivision (D), the Bureau of Prisons has identified several

nonexclusive factors for determining whether "other" extraordinary and compelling reasons

exist.  These include the defendant's criminal and personal history, the nature of his offense,

disciplinary infractions, length of sentence and amount of time served, current age and age at the

time of offense and sentencing, release plans, and "[w]hether release would minimize the

severity of the offense."  BOP Program Statement 5050.50 (Jan. 17, 2019), *available at*

https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  The Program Statement explains that

the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly

extraordinary or compelling circumstances which could not reasonably have been foreseen by

the court at the time of sentencing."  *Id.* at 1.

Ultimately, it is the defendant's burden to prove that he is entitled to compassionate

release under § 3582(c)(1)(A)(i).  *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D.

Mo. 2019); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent

some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of

persuasion lies where it usually falls, upon the party seeking relief.").

Courts have properly concluded that a risk of being infected by the coronavirus fails by itself to justify compassionate release. [I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).

**IV.** **Durham's Motion for Compassionate Release is unwarranted as he has neither met the procedural and jurisdictional requirements nor does his request meet the threshold of an extraordinary and compelling reason to warrant release.**

Defendant Quantavius Durham's motion for compassionate release fails on every ground.

First, Durham has failed to make any request for compassionate release through the BOP. Based on this alone, his request should be dismissed as the mandatory exhaustion requirement is not met.

Second, the Defendant has failed to assert "an extraordinary and compelling reason" to warrant a reduction or placement on home confinement. The Defendant based his compassionate release request on his childhood asthma. The Centers for Disease Control and Prevention (CDC) has determined that persons with moderate or severe asthma, particularly if not well controlled, are at higher risk for severe illness from COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html, visited May 7, 2020). The CDC recommends that persons with moderate to severe asthma continue with current medications, maintain contact with their healthcare provider, know how to use their inhalers and know their asthmatic triggers. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html, visited May 7, 2020). The Defendant has provided no

medical documentation he has been treated for asthma while in BOP custody, that his asthma is either moderate or severe, or that he has had any complications from the condition. Further, there is no information that Durham's asthma, if he indeed has been treated for it while in custody, cannot be fully and adequately treated while in custody. If the Defendant's claim of childhood asthma is sufficient compelling and extraordinary reason to reduce his sentence or release him to home confinement, the Court will be inundated in similar requests, taxing the court system, probation, and jeopardizing the community where the Defendant will be housed.

As stated above, courts have properly concluded that a <u>risk</u> of being infected by the coronavirus fails by itself to justify compassionate relief. Even if Durham has suffered childhood asthma, Durham has not shown a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison. USP Lee has reported no cases of COVID-19, unlike South Carolina to where he asked to be released (almost 7,000 positive cases as of May 8, 2020).

Further, the Defendant has proposed no release plan, other than residing with his mother and step-father in South Carolina. He has provided no plans for employment or an ability to provide safely for himself in a time when jobs are less available due to Covid-19 closures. It is uncertain whether the residence Durham proposes is appropriate or whether the federal probation office in his area has the capability of supervising him. The lack of a plan in this situation compounds an already baseless request.

Finally, the Defendant does not explain how his release on home confinement presents a viable alternative sentence. Durham is serving a 210-month sentence for a violent crime - attempted murder - with a firearm, which was completed in the aid of a violent criminal street gang. He has numerous infractions while incarcerated, including assault, engaging in sexual

acts, and possessing a dangerous weapon. The United States submits that the Defendant was a danger to the community at the time of his criminal activity, and based on his actions while in custody, he will continue to be one. This reason, coupled with the lack of necessity to be release, create an overwhelming reason to deny the Defendant's request.

If the Court disagrees with the United States' position above, any order that this Court issues that grants a defendant compassionate release should require defendant to undergo a 14-day quarantine that BOP controls before any release

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Defendant's request for compassionate release should be denied.

Respectfully submitted,
G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: ___/s/_____
Amy E. Cross,
Special Assistant United States Attorney
Attorney for the United States
721 Lakefront Commons, Suite 300
Newport News, Virginia 23606
Phone: (757)591-4000
Facsimile: (757)591-0866
Email: amy.cross@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2020, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system and a true and accurate copy of the same was mailed to the

petitioner at the following location:

Quantavius Durham, Inmate #87852-083
USP Lee
U.S. Penitentiary
P.O. Box 305
Jonesville, VA 24263

_____/s/_____
Amy E. Cross
Special Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
721 Lakefront Commons, Suite 300
Phone: (757)591-4000
Facsimile: (757)591-0866
Email:  amy.cross@usdoj.gov